IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| KIP HARTMAN, | Cause No. CV 22-57-M-DLC |
| Petitioner, | |
| vs. | ORDER |
| AUSTIN KNUDSEN; MARCIA BORIS, | |
| Respondents. | |

This matter comes before the Court on Petitioner Hartman's application for a writ of habeas corpus under 28 U.S.C. § 2241.  Hartman faces a second trial in Montana's Nineteenth Judicial District Court, Lincoln County, and asserts double jeopardy.  The trial court graciously vacated the trial date pending resolution of the federal petition.  *See* Order (Doc. 6-1), *State v. Hartman*, No. DC 19-75 (Mont. 19th Jud. Dist. Mar. 23, 2022).

## I.  Proceedings in State Court

The State charged Hartman with nine fraud counts stemming from his tax-advice business.  The trial court scheduled nine days for trial, beginning on Tuesday, January 26, 2021, and ending on Friday, February 5, 2021.  *See* Am. Minute Entry (Doc. 1-28) at 1.  To accommodate social distancing, trial was held in the Libby Memorial Events Center.

1

At a pretrial conference on December 22, 2020, the trial court asked whether

trial could be completed in nine days.  Defense counsel said, "Well, looking at the

State's witness lists and our respective exhibit lists, I don't see how we do it in

nine days, but maybe we could, I don't know."  The trial court told the parties nine

days was the limit:  "I am setting nine days and I am not going over nine days."

Pretrial Conf. Tr. (Doc. 10-10) at 15:17–16:7.[1]

At the final pretrial conference, the trial court told the parties that it would

"try to stay out of it" and let the attorneys "[w]ork the case the way you're going to

work the case.  But obviously, we're not going to waste time."  Final Pretrial Conf.

Tr. (Doc. 10-9) at 27:4–16.  Discussing its reluctance to "bring the hammer down,"

the trial court said:

> I may, during the course of the trial.  And I think it's only fair that if I
> think that we're spinning our wheels, if I think we are stuck on an
> issue, if I think we are wasting the jury's time, I'm going to let
> everybody know.  And I'll try to do it gently.  If that doesn't work, it
> will be more forceful.

---

[1]  As will become apparent, the trial court meant what it said—there would be only nine
days for trial.  The trial court maintained meticulous timekeeping throughout the trial and
advised the parties on a regular basis of the time they had remaining, to the minute.  This Court
is sympathetic to the desire of the trial court to get the case tried as expeditiously as possible, to
avoid unnecessary inconvenience to the jurors, and to manage its busy docket.  This case was
also being tried during the peak of the COVID pandemic, in rental space large enough to
accommodate social distancing, in a small county, with a single judge, and limited financial
resources.  Putting the parties "on a clock" is one way to accomplish these goals.  But slavish
adherence to an arbitrary time limitation, set before a single bit of evidence has been introduced,
particularly in a criminal trial where the last witness to testify is frequently the defendant, often
leads to the result which arose here—the trial court's clock has run out, and one witness remains,
the defendant, who has a constitutional right to testify and present a defense.

> You guys are all experienced trial lawyers; you know what's going on.  You know how to get there.  I don't have any concerns about this, but things happen.  We get stuck, we start spinning our wheels.  We think we hear something when we heard something else or any of that.  In those instances, I'm going to remind you.
>
> Because these people [on the jury] are taking nine days out of their lives to get this right.

Final Pretrial Conf. Tr. at 16:6–22.

The parties knew they would each have equal time to present their cases. *See, e.g.*, Final Pretrial Conf. Tr. at 14:4–16.  Several times, however, defense counsel expressed concern that he would not have enough time to conclude his case by Friday, February 5.  *See, e.g.*, *id*. at 14:4–15, 18:23–19:5; 5 Trial Tr. (Doc. 10-4) at 754:8–755:7; 7 Trial Tr. (Doc. 10-6) at 1511:4–7, 1512:8–24.

On the morning of the fifth day of trial, Monday, February 1, the trial court advised the parties that the State had ten hours remaining to conclude its case-in-chief, cross-examine defense witnesses, and present rebuttal.  Defense counsel had 14 hours remaining.  Counsel told the trial court he was "not sure there's 24 hours in this week."  The trial court assured him that six hours of testimony would be heard every day[2] and testimony would conclude on Thursday, leaving Friday "to

---

[2] The decision here does not depend on math, but this figure suggested a potential problem.  The trial court said the State had used 9.5 hours and had 10 hours remaining, for a total of 19.5 hours.  Since the parties had equal time, and Hartman had 14 hours remaining, he had used 5.5 hours.  Together, both parties used 15 hours over the first four days of trial.  On Tuesday, the first day, one witness gave two hours' testimony.  Therefore, during the first three full days of trial, the jury heard a total of 13 hours of testimony, an average of four hours and 20 minutes per day.  At the same rate, in the second week, they would hear only 17 hours and 20 minutes from Monday through Thursday, or 21 hours and 40 minutes even if testimony

do everything else," that is, settling and reading jury instructions and presenting closing arguments. *See* 5 Trial Tr. (Doc. 10-4) at 752:18–24, 753:5–24.

The State rested its case-in-chief at the end of the day on Tuesday, February 2. Defense counsel had a witness waiting who could testify "briefly" and asked to begin his case-in-chief while reserving his motion under Mont. Code Ann. § 46-16-403 (comparable to Fed. R. Crim P. 29). *See* 6 Trial Tr. (Doc. 10-5) at 1261:17–1263:14; *see also, e.g.*, 7 Trial Tr. at 1337:3–1345:25, 1400:1–1406:22; 8 Trial Tr. (Doc. 10-7) at 1526:8–1528:13 (brief defense witnesses). The trial court released the jury for the day to hear the motion first.

After hearing the motion, the trial court said it would have "a time amount" for the parties the following morning. "We got six hours in yesterday . . . . I'm certain we got six in today." It reiterated that the State would have "very little time" and would be limited to three questions on cross-examination if it ran out of time, with no recross. The trial court also said it had "built in some leeway time." 6 Trial Tr. at 1275:19–1276:9. Defense counsel remained concerned:

> Badaruddin:   Nevertheless, Your Honor, I'd like to object on the grounds that may client's being denied his state and federal due process rights to present a defense. I can't do it in two days. I thought I had two-and-a-half, by the way. I thought I had a portion of Friday. I was counting on that. Am I wrong?

---

continued all day Friday.

The Court:      You have—I told you Monday morning you had 14
                hours to use however you want.

Badaruddin:     Yes, sir.

The Court:      That's what you got.  I'll tell you exactly tomorrow
                morning how many hours you have left.  If we have to
                add on because the State has gone over its times, and I
                allow them three questions only, I will allow that to
                yours.  And if we have to go into Friday to adjust for
                that, we can; okay?

Badaruddin:     Yes, sir.

The Court:      That's what I'm telling you.  Whatever the 14 hours
                were the State had, I think somewhere in the
                neighborhood of ten, you had somewhere in the
                neighborhood of 14.  And I've just been doing—I did
                subtraction yesterday.  I'll do subtraction tonight.

Badaruddin:     Yes, sir.  I don't challenge the Court's calculations—

The Court:      I know.

Badaruddin:     —only that I still don't have enough time.  And I'd ask
                for more, like maybe till Monday, maybe five minutes.
                But whatever the Court can consider giving me, I don't
                have enough time left in the week.  And I'm, of course,
                going to use it as efficiently as possible.  But in the end,
                I don't see how I can do it, consistent with Mr.
                Hartman's right to the effective assistance of counsel
                and due process and a fair trial.  Maybe he needs more
                time.  That's what I'm suggesting to the Court.

. . .

The Court:      . . . [T]his is my initial reaction to it, Mr. Badaruddin.  I
                have the breakdowns of directs and crosses.  And I have
                been, I think, quite clear from the beginning of this.
                How much time anyone had to utilize.  And I think it

5

was the first day you told me you were keeping track too.

Badaruddin:    Yes, sir.

The Court:    So this doesn't come as a surprise. It shouldn't come as a surprise. You, on multiple of these witnesses, you crossed longer than there was direct. And I make no comment on that. I think that's entirely appropriate in certain circumstances. You chose how to defend this case.

.  .  .

Badaruddin:    . . . [W]hile I know how much time I've used, I don't think I've wasted it. Sometimes things happen while the witness is on the stand, and I can choose to sit down or keep going. And that's a difficult decision when it's the Defendant's due process rights that weigh in the balance.

The Court:    And I'm not suggesting that you wasted any.

Badaruddin:    Thank you, Your Honor. I'm constantly mindful of the clock ticking.

The Court:    I appreciate that.

Badaruddin:    So I just ask that my client's due process rights to present his defense not suffer for the sake of the constraints we're under. It's his only chance.

6 Trial Tr. at 1276:10–1277:18, 1279:3–15, 1280:1–15.

On Wednesday morning, just before Hartman began his case-in-chief, the trial court advised that the State had 215 minutes, or about three and a half hours, for its cross-examination and rebuttal. The defense had 491 minutes, or about eight hours. *See* 7 Trial Tr. at 1287:9–10, 1287:16–17.

6

The trial court advised the parties of their remaining time at various points on Wednesday and Thursday.  At the afternoon break on Thursday, the trial court told defense counsel he had 37 minutes remaining in his case-in-chief.  *See* 8 Trial Tr. at 1716:7–19.

Defense counsel completed his eleventh witness on Thursday at about 4:45 p.m.  The trial court asked if he wished to call another witness.  Counsel replied that another witness was ready, but he could not finish his direct examination in fifteen minutes.  He said, "We could start, or we could—whatever the Court's pleasure."  *See* 8 Trial Tr. at 1773:7–14.  The trial court said "it doesn't seem to make much sense" to start a new witness.  The jury was excused for the evening recess.  *See id*. at 1773:19–20.

After the jury left, the trial court informed defense counsel that fifteen minutes were all that remained in his case-in-chief.  Counsel objected that his last witness—defendant Hartman—could not testify in fifteen minutes.  Citing *McCoy v. Louisiana*, he argued that Hartman, personally, was entitled to choose whether to testify and that preventing him from doing so because of counsel's time mismanagement would be "structural error"— that is, reversible regardless of whether he could show he was prejudiced by not testifying.  *See* 8 Trial Tr. at 1775:1–1777:24.  Counsel said he had provided ineffective assistance by failing to complete his case, and he urged the trial court to give him extra time so that

7

Hartman could testify.  He concluded:

> I made a decision as to what witnesses to call, how long—what
> questions to ask on cross.  I tried to be efficient.  I have failed.  But I
> cannot mismanage Mr. Hartman's right to testify away.  And if I have,
> I submit the Court must intervene to protect his right to testify.
>
> In other words, what you have to do is if you—you're going to
> have to order him off the stand.  And I submit you cannot do that,
> consistent with the Sixth Amendment, and consistent with Article 2 of
> the state Constitution.  He gets his opportunity to talk, and I've taken
> it away from him.  I have provided ineffective assistance.  I have
> failed to provide or safeguard his state Constitutional right to the
> assistance of counsel, because I have failed to leave enough time for
> him to testify.
>
> So I submit that the Court must allow him to testify consistent
> with the Rules of Evidence, 401, 402, 403, all the other rules.  He
> can't be redundant.  He can't waste time.  But he gets to tell his story.
>
> Otherwise, the error of forcing him to stop talking is such that
> the conviction, if one results, could not stand.  And the Court . . .
> should not inquire as to whether my choices were reasonable.  It's
> simply a question of whether his right to testify was observed.  And if
> he doesn't get to testify, it will not have been observed.

8 Trial Tr. at 1777:9–1778:11.

When the trial court, as it said, "pressed" counsel to say how much time

Hartman needed, counsel requested three hours:  "Nine counts.  I forget how many

applications.  All these tax issues.  Yeah, I think he needs three hours."  *See* 8 Trial

Tr. at 1779:3–6; *see also* Order re: Mot. to Dismiss at 3 para. 4 (Doc. 1-2 at 45);

Order re: Mistrial at 2 para. 4 (Doc. 1-2 at 2194).  The trial court also asked how

long defense counsel had known his client wanted to testify.  Counsel explained it

was his custom and practice to have specific  conversations with all his clients

about testifying, generally recommended against it, and deferred the ultimate

decision as long as possible.  He said he and Hartman "ultimately determined yesterday that it's probably going to be best" for him to testify.  The trial court took counsel's request for more time under advisement over the evening recess. *See* 8 Trial Tr. at 1781:11–1782:15.

The next morning, the trial court began by asking Hartman's counsel to restate whether "[t]his is a situation where effective assistance of counsel doesn't apply" and that the issue was "structural error."  Counsel agreed.  The trial court asked whether he had any "additional legal argument" to make.  Defense counsel said he did not.  *See* 9 Trial Tr. (Doc. 10-8) at 1786:3–1787:4.  The State suggested Hartman's time to testify could be limited.  It requested equal time to cross-examine Hartman should the trial court allow more than 15 minutes for his testimony, plus its remaining rebuttal time.  *See id.* at 1787:1–24.

The trial court found that "Mr. Hartman cannot testify as needed in the 15 minutes" remaining in the defense case-in-chief.  *See* 9 Trial Tr. at 1788:17–19.  It noted counsel's representation that Hartman had expressed interest in testifying from the outset of their relationship.  *See id.* at 1789:12–13.  The trial court concluded that, in view of the need to settle instructions and conduct closing arguments, allowing Hartman to testify for three hours would significantly extend the trial:

The Court:    [I]t's clearly going to take at least two more days. . . . Which is probably not coincidental that after the trial started, Mr. Badaruddin asked for those two days.

. . .

        Mr. Badaruddin, throughout the entirety of this case, has been in constant communication with his client. They have talked back-and-forth. They have known what was going on. Mr. Badaruddin, for his own witnesses, did not have paper exhibits available. He had to pack a computer around this place to show them. I don't know why that is. I think that it was a deliberate attempt to stall the proceedings. I think from the beginning there has been a deliberate attempt to stall this proceeding.

        So, having made that finding, and knowing that Mr. Hartman has that right, he gets to testify, and he should testify for as long as he feels is appropriate and necessary, we don't have the time to get this done within the allotted period of time. I have no choice but to declare a mistrial. I have to. Because he has those rights. And I can't put it any place else.

        But having done that, here's what I'll tell you. Mr. Badaruddin will be responsible for the costs associated with these nine days. That means the facility, that means the jury, that means the State's witnesses, that means the State's added costs of room, board, and lodging. Because as has been pointed out to me repeatedly, I have the sua sponte obligation to protect this Defendant's rights from the deliberate, tactical, strategic, consistent, and calculated maneuvers of his attorney.

        Now, I will have a written opinion done by the end of the day; all right? It will identify how I want the State to submit those costs. It will give Mr. Badaruddin a period of time to object to those costs and, if necessary, a hearing on those costs.

        Any questions from the State?

Boris:    No, Your Honor.

10

| | |
|---|---|
| The Court: | Any questions, Mr. Badaruddin? |
| Badaruddin: | Your Honor— |
| The Court: | Now, let's be clear.  I asked do you have any questions. |
| Badaruddin: | We object to the mistrial.  But I just want to point out to the Court, I think we can get him done in 90 minutes.  Mr. Hartman would like to — |
| The Court: | That is different than what you told me last night. |
| Badaruddin: | We tightened it up last night.  I've talked to Mr. Hartman.  I said Look, we've got to have a plan for tomorrow.  We've got to use as little time as possible. |
| The Court: | So then what we have is, so now I rely on what you tell me, I come in here and I make a ruling, and you say Oh, wait, Judge, no, I'll do it shorter.  And then you file an appeal saying The judge made me shorten it because he threatened me with a mistrial.  Sit down, Mr. Badaruddin.  I have no more questions for you, sir.<br><br>        All right; we are in recess.  When the jury gets here, I'll call everybody in and I will advise the jury of what we are doing. |

9 Trial Tr. at 1790:9–12, 1790:17–1792:23.

After the recess, counsel for both parties asked to "go back on the record before we brought in the jury." *Id*. at 1793:1–3.  Defense counsel asked the trial court to reconsider its declaration of a mistrial.  He requested that the defense be allowed to proceed or, alternatively, that the trial court take the decision under advisement "and allow us to make what use we can of this day." *Id*. at 1793:10–14.

The State took "no position on Mr. Badaruddin's motion to reconsider" but said it was "ready to go" and would "attempt to streamline everything to get this matter before the jury." *Id*. at 1794:8–24.

The trial court said:

> [W]hat I struggle with is being told, and agreeing, that I have a level of obligation to protect Mr. Hartman. I absolutely do; right? And that's a blurry line. But when it is thrown in my face, I don't know what else to do with it when I am told it is structural error for me not to do that. And when I make a ruling, then I don't know how I can reconsider it.

9 Trial Tr. at 1795:4–10.

The State suggested defense counsel might "meaningfully confer[] with his client and, together with his client, choose[] a path forward here that would include waiver of structural error on this point." *See* 9 Trial Tr. at 1796:5–8. The trial court asked:

> How do we do that, if perhaps the advice that he's getting to waive it is from the individual who created it? How do we do that? We've come to a point where we've—the games have gotten in the way of justice. That's what's happened here.
> . . .
>     And I don't think Mr. Hartman can make an informed consent, having had a conversation with Mr. Badaruddin about this matter, based on what was argued last night and based on what was my previous order.
> . . .
>     My order stands.

*Id*. at 1796:11–15, 1801:6–9, 1801:25.

Defense counsel said, "Your Honor, all I can say is, conflict free or otherwise, Mr. Hartman wants this verdict from this jury."  The trial court said it understood but had "a duty above you telling me what Mr. Hartman wants":

> I don't believe it's appropriate for me to take your statements to me as to what Mr. Hartman wants as the determining factor at this point in time.  Mr. Hartman needs to talk to a different lawyer before he makes that decision, and I'm finding that it cannot happen.

*Id.* at 1802:10–14.

Defense counsel asked to "address certain basic assumptions," including the trial court's assertion that he had "been doing this all along."  *Id.* at 1802:15–17.  He said:

> The way the case played out was not as predictable as you may think. There were many surprises.  And I know the hours were even, but the days were not.  We started [the defense case] on Wednesday.  I thought we were going to start on Monday.  The State thought I was going to start on Monday. . . .  They did have more days, and I don't know what the record says.  I'm sure it's exactly as the Court has indicated.  But days, hours, they had more days than we did.  It affected my ability to schedule the case.
>
> I feel as if—I was not stalling.  I was trying to move as quickly as possible.  Yes, there were occasions when I could have moved faster, but I was always mindful of the time, and I wasn't trying to stall.  [Mr. Hartman is] trying to get a verdict. . . .  [T]here's no manifest necessity for a mistrial.  Especially since we still have six hours to work with.  I don't see why we couldn't try and make the best use of them, or make a use of them.

9 Trial Tr. at 1803:9–24, 1804:5–8.

The trial court concluded:

13

> This order [for a mistrial] is agreeing with what you said to me
> yesterday.  It is taking what you told me yesterday as the true and
> accurate facts, and it is applying those true and accurate facts to the
> law as I was given, as I read and as I understand it to be.  And I read it
> and understand it to be consistent with what you've said.  And the
> facts as was given to me when I was asked to make this decision, I
> made it.  And after making it, I am presented with alternative facts.
>
> I don't think it is appropriate for me to reconsider, and I'm not
> going to.

9 Trial Tr. at 1806:10–20.

The trial court informed the jury that it had declared a mistrial and excused the jurors, concluding the proceedings at 9:25 a.m.  *See id*. at 1807:12–19.

At 4:47 p.m., the trial court issued a written order adding or elaborating on some factual findings in support of its finding that defense counsel deliberately created delay.  *See* Order re: Mistrial at 2 paras. 1–2 (Doc. 1-2 at 2194).  The trial court concluded, "Defense counsel's mismanagement of the time allotted cannot affect Defendant's right to testify for as long as needed or necessary."  *Id.* at 4.  In a subsequent order denying Hartman's motion to dismiss for double jeopardy, the trial court reiterated, "Defendant could not waive or limit or in any way compromise his right to testify on his own behalf without first being given meaningful opportunity to seek independent advice from different counsel."  Order re: Mot. to Dismiss at 6 para. 4 (Doc. 1-2 at 48).

After the trial court set a new trial, Hartman petitioned the Montana Supreme Court for a writ of supervisory control, arguing that a mistrial was not

14

necessary and a second trial would violate the Double Jeopardy Clause.  Denying

the writ, the Montana Supreme Court held:

> If Hartman was convicted as a result of the District Court . . . limiting
> Hartman's testimony to the time remaining, Hartman's counsel had
> already made it clear that he would pursue a claim of ineffective
> assistance of counsel.  If Hartman's ineffective assistance claim was
> successful, Hartman's conviction would be vacated and the matter
> remanded for a new trial.  Hartman's remedy would not be reversal
> without retrial.  A remedy must neutralize the taint of a constitutional
> violation, while at the same time not grant a windfall to the defendant.
> It would be ironic, to say the least, if the District Court's alleged
> abrogation of Hartman's constitutional right to testify could result in
> his retrial, but the District Court's protection of the same right could
> not.  Hartman is not entitled to such a windfall.
> . . .
> The record here reflects that the District Court was placed in an
> untenable situation, conscientiously considered the options available
> to it, and correctly determined that circumstances necessitated
> terminating the trial to protect Hartman's constitutional rights.

Order at 6–7, *Hartman v. Nineteenth Jud. Dist. Court*, No. OP 22-0037 (Mont.

Mar. 8, 2022), *available at* https://supremecourtdocket.mt.gov.

## II.  Analysis

### A.  Legal Framework

#### 1.  Purpose of the Double Jeopardy Clause

The Fifth and Fourteenth Amendments prohibit twice placing a defendant in

jeopardy.  *See* U.S. Const. amends. V, XIV § 1; *Benton v. Maryland*, 395 U.S. 784,

787 (1969).

The "underlying idea" of the protection against double jeopardy "is that the State with all its resources and power should not be allowed to make repeated attempts" to convict a defendant, *Green v. United States*, 355 U.S. 184, 187–88 (1957), "thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty," *id*.

"[O]ne of the principal threads making up the protection embodied in the Double Jeopardy Clause is the right of the defendant to have his trial completed before the first jury empaneled to try him." *Oregon v. Kennedy*, 456 U.S. 667, 673 (1982). For that reason, jeopardy attaches when the jury is sworn. *See Crist v. Bretz*, 437 U.S. 28, 35–36 (1978).

> [T]he crucial difference between reprosecution after appeal by the defendant and reprosecution after a *sua sponte* judicial mistrial declaration is that in the first situation the defendant has not been deprived of his option to go to the first jury and, perhaps, end the dispute then and there with an acquittal. . . . [W]here the judge, acting without the defendant's consent, aborts the proceeding, the defendant has been deprived of his "valued right to have his trial completed by a particular tribunal."

*United States v. Jorn*, 400 U.S. 470, 484 (1971) (quoting *Wade v. Hunter*, 336 U.S. 684, 689 (1949)).

"A trial judge properly exercises his discretion to declare a mistrial if an impartial verdict cannot be reached, or if a verdict of conviction could be reached but would have to be reversed on appeal due to an obvious procedural error in the

16

trial." *Somerville*, 410 U.S. at 464.  If persisting with the trial "at best would have produced a verdict that could have been upset at will by one of the parties, the defendant's interest in proceeding to verdict is outweighed by the competing and equally legitimate demand for public justice." *Id*. at 471.

In sum, declaring a mistrial over a defendant's objection may be appropriate if "a verdict of conviction could be reached but would have to be reversed on appeal."  At the same time, declaring a mistrial always deprives the defendant of the first jury's verdict.  These competing interests must be carefully balanced.  A mistrial, therefore, must be supported by "manifest necessity"—not absolute, no-other-option necessity, but a "high degree" of necessity.  *See Arizona v. Washington*, 434 U.S. 497, 505–06 (1978).

### 2.  28 U.S.C. § 2241

In one respect, the guarantee against double jeopardy is almost unique among federal constitutional rights.  Nearly all other federal rights can be fully vindicated through appeal or collateral attack after conviction and sentencing.  A claim of double jeopardy, however, "is necessarily forfeited by delaying review until after [a second] trial."  *Carden v. Montana*, 626 F.2d 82, 84 (9th Cir. 1980) (following *Moore v. DeYoung*, 515 F.2d 437 (3d Cir. 1975)).  It therefore presents "extraordinary circumstances where irreparable injury can be shown."  *Brown v. Ahern*, 676 F.3d 899, 903 (9th Cir. 2012) (quoting *Carden*, 626 F.2d at 84, and

*Perez v. Ledesma*, 401 U.S. 82, 85 (1971)).  A federal court need not abstain under *Younger v. Harris*, 401 U.S. 37 (1971), to await the possible entry of judgment and subsequent ordinary course of direct and collateral review.  The petitioner may proceed under 28 U.S.C. § 2241(c)(3).  *See, e.g.*, *Stow v. Murashige*, 389 F.3d 880, 885–88 (9th Cir. 2004).

The doctrine of comity demands that state courts be given the first opportunity to review asserted violations of federal constitutional rights.  But 28 U.S.C. § 2241 does not impose the high standards of review that appear in § 2254(d).  This Court need not decide whether the Montana Supreme Court's decision was "contrary to, or an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States" or was "based on an unreasonable determination of the facts in light of the evidence presented."  28 U.S.C. § 2254(d)(1), (2).

Still, a trial judge's assessment of the situation before him and the necessity of a mistrial is entitled to considerable deference.  Deference is greatest in the "classic" mistrial situation of a jury unable to agree on a verdict, when the judge must decide whether the jury should take more time to deliberate or whether the jury will prove unable to arrive at a verdict fairly and in a reasonable time.  *See Washington*, 434 U.S. at 510.  Little deference is due when "the trial judge acts for reasons completely unrelated to the trial problem which purports to be the basis for

the mistrial ruling." *Id*. at 510 n.28 (citing *United States v. Gordy*, 526 F.2d 631 (5th Cir. 1976)).  This case, like most, falls somewhere between the two poles.

## B.  Application

The trial court found that "from the beginning there has been a deliberate attempt to stall this proceeding."  9 Trial Tr. at 1790:24–25.

The Montana Supreme Court did not mention the trial court's finding of a deliberate strategy.  Emphasizing defense counsel's admission of ineffective assistance, the trial court held that a mistrial was necessary to protect Hartman from his own counsel's poor time management.  It noted, but did not specifically address, counsel's suggestion to carry on with trial to the end of the day.  *See* Order at 4, *Hartman*, No. OP 22-0037.  It did not mention the possibility that the jury might have acquitted Hartman.  *See id*. at 6–7.

### 1.  The "Three-Hour" Ruling

On Thursday evening, the trial court gave no notice that it was considering declaring a mistrial first thing Friday morning.  The word "mistrial" appears in the trial transcript for the first time when the trial court declared one.  Further, in eight days of trial, the trial court expressed no concern at any point that the defense team was wasting time.

Based on the trial court's arbitrary time limitations, if Hartman was going to testify for three hours, there likely were not enough hours in the day on Friday for

the State to cross-examine and then present its rebuttal case, for the parties and trial court to settle jury instructions, and for each side to make its closing arguments.

Confronted with this situation, another judge might have decided to press ahead, extended the working day beyond 5:00 p.m., perhaps considered using the weekend, or set aside a few hours the following Monday or Tuesday for closing arguments. But this Court need not decide whether failing to pursue these options was an abuse of discretion.[3] The trial court set time limitations in this case and determined that there was not sufficient time remaining to complete the trial if Hartman needed three hours to testify.

## 2. The "90-Minute" Ruling

Immediately after hearing the trial court's precipitous declaration of a mistrial, counsel explained that he and Hartman had pared his testimony down to an hour and a half. The trial court refused to consider counsel's statement because

---

[3] Neither party has cited a single case where a mistrial was declared solely because the trial court set a limit on the number of trial days and time ran out. The Court has not found one. *Cf. Abbott v. Mandiola*, 82 Cal. Rptr. 2d 808, 811 n.5 (Cal. Ct. App. 1999) (court reviewing civil case explains why "trial . . . should not become a race against the clock."). The decisions all seem to include factors in addition to time running short. *See, e.g.*, *Koster v. State*, 286 S.W.3d 152, 159–61 (Ark. 2008) (defense counsel brought live explosive device into courtroom, necessitating police activity and causing delay, then filed belated motion regarding preservation of evidence); *see also Vasquez-Ramirez v. State*, 591 S.W.3d 379, 383–85 (Ark. Ct. App. 2019) (giving examples). If running out of time, alone, were a proper reason to declare a mistrial, it seems likely many cases would say so. On the other hand, the usual palliative for shortness of time is judicial control of the trial day—longer jury hours, shorter breaks, and dealing with legal issues outside of jury time. Or here, simply allowing Hartman a reasonable period of time to testify. If running out of time is not a sound reason for a mistrial, then the trial court's declaration of one was clearly erroneous, whether it was due to defense counsel's deliberate delay or poor time management. Hartman would still be entitled to dismissal of the charges.

it had already decided—without notice and without giving counsel an opportunity to respond—that defense counsel deliberately stalled the proceeding.

This ruling was an abuse of discretion. The trial court did not explain the objective counsel hoped to realize by stalling. This Court does not perceive any strategic objective in delay that could be consistent with counsel's decision to reduce the time his client's testimony would take in order to complete trial on Friday. Counsel's effort negated the trial court's finding that he was deliberately protracting the trial.

If the trial court had taken defense counsel's suggestion and proceeded with the trial, three outcomes were possible. First, Hartman might be convicted. Second, Hartman might be acquitted. There might be a mixed verdict, but that would not change the analysis, so it need not be separately considered. Third, the trial still might not have been completed. By stubbornly adhering to an arbitrary limitation on the time allotted for trial, the trial court rendered all three possible outcomes impossible.

### a. What If Hartman Was Convicted?

If Hartman had an opportunity to testify and was convicted, the verdict could not have been "upset at will." *Somerville*, 410 U.S. at 471.

This Court has found no authority holding that a defendant has a right to testify "for as long as he feels is appropriate or necessary," as the trial court said.

With a few qualifications not relevant here, a defendant who testifies is treated "just like any other witness." *Portuondo v. Agard*, 529 U.S. 61, 70 (2000); *Grunewald v. United States*, 353 U.S. 391, 420 (1957). He is subject to the "ordinary power of a trial judge," *Brooks v. Tennessee*, 406 U.S. 605, 612–13 (1972); *Menendez v. Terhune*, 422 F.3d 1012, 1030–32 (9th Cir. 2005), to control the trial, including by preventing "excessive consumption of time," *Menendez*, 422 F.3d at 1033 (citing *United States v. Sheffer*, 523 U.S. 303, 308 (1998); *Rock v. Arkansas*, 483 U.S. 44, 55 (1987); *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973)); Mont. R. Evid. 403; 8 Trial Tr. at 1780:1–3.

Like the testimony of any other witness, the length of Hartman's testimony had to be balanced against the time available and the facts to be established or refuted. Striking this balance was counsel's job to execute, in consultation with the client. *See, e.g.*, *Brooks*, 406 U.S. at 612–13 (holding a state statute requiring a defendant either to testify as first defense witness or waive the right to testify unconstitutionally restricted ability of "the accused and his counsel" to decide "whether, and when in the course of presenting his defense, the accused should take the stand."); *Ferguson v. Georgia*, 365 U.S. 570, 596 (1961) (holding unconstitutional a state statute requiring a defendant to make his statement without the assistance of counsel's questioning, because "otherwise, in Georgia, the right to be heard by counsel would be of little worth.") (internal quotation marks and

citation omitted); *Powell v. Alabama*, 287 U.S. 45, 69 (1932) (defendant is entitled to "the guiding hand of counsel at every step in the proceedings against him.").

As the trial court noted, the client's right to testify does indeed have a different status than other trial rights that might support ineffective assistance claims. For example, counsel decides whether to call other witnesses and what questions to ask, how to cross-examine an expert, and how to parry prosecution witnesses' testimony in closing argument. If counsel performs unreasonably, a severely prejudiced defendant will have a new trial. *See Strickland v. Washington*, 466 U.S. 668, 687–88, 692 (1984); *State v. Polak*, 499 P.3d 565, 572 ¶ 23 (Mont. 2021); *Whitlow v. State*, 183 P.3d 861, 864 ¶¶ 10–11, 867–68 ¶¶ 20–21 (Mont. 2008). By contrast, only the client can decide certain matters, such as the "fundamental objective" of the representation, whether to plead guilty or stand trial, whether to appeal, and whether to testify at trial. *See, e.g.*, *McCoy v. Louisiana*, __ U.S. __, 138 S. Ct. 1500, 1508 (2018).

Because these decisions belong to the client personally, claims alleging that counsel violated them are analyzed differently than other claims of ineffective assistance. For instance, if counsel knows a client wants to appeal but she does not timely notice the appeal, the client is entitled to relief because he was deprived of an appeal. It does not matter whether he can show a nonfrivolous issue to raise on appeal. It does not even matter that bad consequences may follow from an appeal.

23

*See, e.g., Garza v. Idaho*, __ U.S. __, 139 S. Ct. 738, 743–44 (2019); *Roe v. Flores-Ortega*, 528 U.S. 470, 484 (2000); *United States v. Sandoval-Lopez*, 409 F.3d 1193, 1196–98 (9th Cir. 2005). Relief takes the form of the appeal the client was denied. *See Sandoval-Lopez*, 409 F.3d at 1198. But the client does not decide what issues to raise on appeal, *see Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Jones v. Barnes*, 463 U.S. 745, 754 (1998) (reversing appellate court's ruling that counsel must raise all nonfrivolous issues client wants to present), or how long the brief should be, *see* Fed. R. App. P. 32(a)(7).

Likewise, if the client chooses to go to trial, counsel cannot proceed by conceding guilt, because contesting guilt is the purpose of trial. *See McCoy*, 138 S. Ct. at 1509. But it is still counsel's job to decide which elements of an offense to contest, which witnesses to call, what evidence to challenge, and what objections to raise. *See id.* at 1510. Using their professional judgment and experience, criminal defense attorneys do the best they can with decisions clients make on the points clients decide.

By this reasoning, a denial of the client's right to testify also cannot be assessed for harmlessness. It is "either respected or denied." *McCoy*, 138 S. Ct. at 1511 (quoting *McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8 (1984)). The right is not violated when counsel does not ask all the questions the client wants to answer or when counsel does not let the client speak at will. It is violated if counsel

knows the client chooses to testify and yet knowingly fails or refuses to call him as a witness.[4]

This was the situation presented at Hartman's trial.  Counsel knew his client wanted to testify, but he ran out of time to call him.  During the overnight recess between Thursday evening and Friday morning, the trial court considered whether it should give counsel the chance to correct his mistake.  It decided it could not allow enough time for counsel to correct his mistake, because the client needed three hours to testify.  But while the trial court was deliberating, counsel and client were not idle.  They focused Hartman's testimony in the hope of completing trial on Friday.  Lawyers and clients have conversations of this nature all the time.[5]

---

[4] Federal appellate courts follow different approaches to ineffective-assistance claims alleging that counsel failed to advise the defendant of her right to testify, but all recognize the matter is entrusted to attorney and client and does not require the mid-trial intervention of the court or of outside counsel.  The Ninth Circuit holds that, "[w]hen a defendant is silent in the face of his attorney's failure to call him as a witness, he has waived his right to testify," even if he later claims counsel did not tell him he had a right to testify.  *United States v. Nohara*, 3 F.3d 1239, 1243–44 (9th Cir. 1993) (following *United States v. Edwards*, 897 F.2d 445, 447 (9th Cir. 1990)); *see also Edwards*, 897 F.2d at 447 n.*.  The Seventh Circuit has held that a trial court does not err either by asking or not asking defendants whether they intend to testify.  *See United States v. Stark*, 507 F.3d 512, 514–15, 516–19 (7th Cir. 2007).  In an unpublished decision, the Eleventh Circuit affirmed the trial court's finding in a hearing under 28 U.S.C. § 2255 that counsel told the client he could choose to testify, contrary to the client's testimony that he did not.  *See Jean v. United States*, 225 Fed. Appx. 853, 2007 WL 1494032 (11th Cir. May 23, 2007) (per curiam); *see also* Fed. R. App. P. 32.1(a).

[5] The Supreme Court holds that a trial judge may prohibit attorney and client from discussing the client's testimony during a recess taken "while the testimony is in progress," because the Sixth Amendment does not protect an attorney's right to consult with any other witness during her ongoing testimony.  *See Perry v. Leeke*, 488 U.S. 272, 284–85 (1989).  But the Court also holds that a trial judge cannot limit attorney-client discussions during a longer recess, such as an overnight break, even if their discussions include the client's ongoing testimony.  *See Geders v. United States*, 425 U.S. 80, 88–91 (1976); *see also Perry*, 488 U.S. at 284.  For a helpful discussion of the reasoning behind these cases, see *United States v. Triumph*

By allowing trial to proceed and Hartman to take the stand, the trial court would have *eliminated* a "structural error," *McCoy/Garza* type of claim, and kept any appellate issues within the customary bounds of a *Strickland* analysis. This approach maintains counsel's control over strategic decisions, the client's right to the assistance of counsel of his choice, and the client's right to the effective assistance of counsel. *See, e.g.*, *State v. Manley*, 127 P.3d 954, 961–62 (Idaho 2005). In any given case, a lawyer might keep a short leash on a client's testimony even though he knows the client wants to talk about all manner of things. Counsel may do so to protect the client from further troubles, or to limit damage the client may do to the defense case, or to focus on other testimony or evidence, or to get the case wrapped up and delivered to the jury. At the last minute, the client might decide *not* to testify for any number of reasons. Even in courts where defendants are advised they have a right to testify and asked whether they intend to waive or assert it, this Court is not aware of any practice allowing judicial inquiry into this decision. Courts protect the confidentiality of attorneys' and clients' midtrial decisions with unquestioned regularity, not to say ferocity, based on attorney-client privilege and the Sixth Amendment right to counsel.

The questions counsel asks the client, as well as the time counsel allots,

---

*Capital Group, Inc.*, 487 F.3d 124, 127–39 (2d Cir. 2007), and *United States v. Sandoval-Mendoza*, 472 F.3d 645, 650–52 (9th Cir. 2006).

represent "strategic choices about how best to *achieve* a client's objectives." *McCoy*, 138 S. Ct. at 1508 (emphasis in original). *Strickland* applies to such choices. *See id*. Just as any *Garza*-type error is nixed as soon as an attorney files a notice of appeal, any error in not allowing a client to testify is avoided as soon as, knowing her client has chosen to testify, an attorney calls him to the stand.

If Hartman testified and then was convicted, he might well have raised a claim of ineffective assistance of counsel on direct appeal or in postconviction relief. He would have to show that counsel unreasonably failed to leave enough time for his testimony. He would also have to show a reasonable probability that he would have been acquitted on at least one count, or that his sentence would be less harsh, if only he had had more time to testify. *See Strickland*, 466 U.S. at 687–88, 692. Hartman could make exactly the same claim about "any other witness" counsel called to testify and "any other witness" counsel cross-examined.

Far from indicating incompetence, alternative facts, or a deliberate strategy of delay, counsel's overnight consultation with his client to reduce the time needed for his testimony was a hallmark of competence. Counsel did not violate his client's right to testify. He provided the means to realize it. By reaching a point where trial might be completed on Friday with his client's testimony, defense counsel did precisely what the trial court, his client's constitutional rights, and the standards of the legal profession required of him.

27

### b.  What If Hartman Was Acquitted?

"It is a chancy business indeed for a judge, or anyone for that matter, to predict a verdict that a jury may return in a case, even when the judge determines that counsel's performance is ineffective."  *Commonwealth v. Phetsaya*, 663 N.E.2d 857, 861 (Mass. Ct. App. 1996).  For this reason alone, a judge's *sua sponte* declaration of a mistrial "because of perceived inadequacy of defense counsel is—and certainly should be—an extremely rare event."  *State v. Harrison*, 578 N.W.2d 234, 239 (Iowa 1998).[6]

The *Harrison* Court's rule has a strong conceptual foundation.  Objectively unreasonable performance is only one prong of a Sixth Amendment violation.  Had the trial been completed and the jury returned a verdict of acquittal, then Hartman would have suffered no prejudice from counsel's self-alleged unreasonable performance.  Acquittal would not show that the defendant prevailed *despite* a Sixth Amendment violation.  Acquittal would conclusively prove that *no* Sixth Amendment violation occurred.  An acquittal based on "an egregiously erroneous foundation" does not authorize a new trial, *see Washington*, 434 U.S. at 503 (quoting *Fong Foo v. United States*, 369 U.S. 141, 143 (1962) (per curiam)), but even if it did, unreasonable performance by defense counsel could not make an

---

[6]  Misconduct by defense counsel that is prejudicial to the State is different and is discussed below in subsection (e).

acquittal "erroneous."

### c.  What If Trial Was Not Completed on Friday?

Perhaps the case would not have been completed even if the trial court agreed to allow Hartman 90 minutes to testify.  In that event, the defendant would nonetheless have had the benefit of the only opportunity the trial court could give him to obtain the verdict of the first jury empaneled to try him.

Of course, attempting but failing to complete trial might have given the State an opportunity to hear at least a portion of Hartman's testimony, prepare to meet it at the next trial, and also hold him to it in the next trial.  But whether to take that risk for the sake of potentially concluding the case on Friday was a strategic decision to be made by counsel in consultation with the client.  No one else had enough information or insight to make it.

### d.  Was Mistrial a Means of Balancing Hartman's Rights?

A defendant cannot always realize all of his constitutional rights.  For instance, he has a right to present a defense, including his own testimony, but he also has a right to remain silent and put the prosecution to its burden of proving the case without his testimony.  He cannot do both.  He is entitled to a speedy trial, but he also has a right to prepare a defense and subpoena witnesses.  Sometimes he cannot have both a speedy trial and an adequately prepared defense.  Advice from counsel helps him to choose which rights to assert and which to relinquish.

29

Recognizing that the trial court was in a difficult position, the Montana Supreme Court held that it appropriately balanced Hartman's right to effective counsel against his constitutional protection against double jeopardy.

Declaring a mistrial, however, ineluctably deprived Hartman of his chance to hear the verdict of the first jury empaneled to try him.  The mistrial ruling prejudiced him by "subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity." *Green*, 355 U.S. at 187.  It also "enhanc[ed] the possibility that even though innocent he may be found guilty," because the State would have an opportunity to take almost his entire defense case into account—except for his testimony—to sharpen its presentation, refute or undermine his defense, and improve its chances of convicting him at a second trial. *See id*. at 187–88.  Hartman would not necessarily be able to call all the same witnesses at a second trial.  So far as this Court can see, declaring a mistrial on Friday morning did not achieve anything that could not be equally or better achieved by continuing with trial to the end of the day.

A reasonable and competent attorney might have decided it was not possible for Hartman to testify adequately in 90 minutes.  But the record does not indicate any reason to question defense counsel's efforts to allow Hartman to testify. Counsel knew what Hartman wanted to say and needed to say, knew whether those

30

things overlapped, and knew what testimony he wanted to elicit to support his closing argument. The trial judge did not know and was unable to inquire whether counsel had tried throughout the proceedings to dissuade Hartman from testifying or whether only the obvious time crunch finally showed Hartman that he could not say everything he wanted to say and still get the case to the jury on Friday. A court may limit the time for a defendant's testimony, but it is simply not able to decide how much time the defendant needs or whether the defendant should or should not testify in the time available. *See, e.g.*, S*tate v. Troka*, 880 N.W.2d 161, 166–69 (Wis. Ct. App. 2014).

Regardless of whether defense counsel's performance is flawless or abysmal, the defendant has a federal constitutional interest in the verdict of the first jury empaneled to try him. *See Kennedy*, 456 U.S. at 673. Declaring a mistrial due to defense counsel's trial errors and over the defendant's objection can compound counsel's errors by also depriving the defendant of whatever chance he had at the first jury's acquittal. In some situations, it may be necessary to declare a mistrial due to defense counsel's choices.[7] It was not necessary here.

---

[7] *Carrillo v. Superior Court*, 52 Cal. Rptr. 3d 614 (Cal. Ct. App. 2006), provides three examples of "extreme" situations where defense counsel may cause sufficient prejudice to the defendant to support a mistrial. If defense counsel discovers a conflict of interest mid-trial, asserts in opening statement facts that are contrary to those the client will testify to, or "disappear[s] without a trace," a court may safely declare a mistrial. The conflict-of-interest case was mistried over the defendant's objection. That is sensible, as a conflict affects not only the defendant but also counsel's previous client. In the latter two instances, the defendant moved for and was erroneously denied a mistrial. *See Carillo*, 52 Cal. Rptr. 3d at 624–25. In *Donaldson v.*

31

### e. Was Mistrial Necessary to Protect the State?

"Important public policy protects even the prosecution's right to fair trials and the pursuit of truth." *Lawson v. Murray*, 837 F.2d 653, 656 (4th Cir. 1988), *quoted in United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 641 (9th Cir. 2012). Without running afoul of the Double Jeopardy Clause, a trial court may grant a mistrial to protect the State's right to a fair trial.

In *Arizona v. Washington*, 434 U.S. 497 (1978), defense counsel's opening argument told the jury that his client had already been tried once, but he was awarded a new trial "because of the misconduct of the County Attorney" who "withheld evidence" at the first trial. *See id*. at 498–99. The State moved for a mistrial, arguing that the jury would be unfairly biased against it. Defense counsel claimed he was entitled to present evidence of the prosecution's conduct in the previous trial but adduced no supporting authority. The trial court declared a

---

*Reid*, No. 1:11-cv-1035, 2012 WL 314184 (N.D. Ohio Feb. 1, 2012), *aff'd*, 552 Fed. Appx. 554 (6th Cir. 2014), the court upheld the state court's mistrial ruling because defense counsel did not listen to defense investigators' recordings of witness statements, then misrepresented them as exculpatory, then conceded they were not. *See id*. at *1, *9; *see also* 552 Fed. Appx. at 564–65. Unless counsel are familiar with the evidence they know of, they cannot reasonably conduct the defense or even reasonably advise the client about his choice between pleading guilty and standing trial. In *Flores v. Callahan*, No. SACV 18-543, 2020 WL 3260096 at *16 (C.D. Cal. May 19, 2020), *adopted*, 2020 WL 3258402 (C.D. Cal. June 16, 2020), defense counsel altered an expert's report, allowing the prosecution to transform "a strong defense witness into a damaging witness for the prosecution." Even when defense counsel does something obviously questionable, such as failing to challenge inadmissible evidence, she may have a strategic reason to forego objection. Courts should be careful not to impose on defense counsel a duty to assert all available roadblocks to the State. *See State v. Moran*, 753 P.2d 333, 337–38 (Mont. 1988) (Hunt, J., dissenting). At any rate, none of these examples is similar to Hartman's situation.

mistrial and set another trial.  The defendant claimed double jeopardy prohibited another trial, because a mistrial was not necessary.

The Supreme Court acknowledged that "some trial judges might have proceeded with the trial after giving the jury appropriate cautionary instructions." *Washington*, 434 U.S. at 511.  But it also said that, "[u]nless unscrupulous defense counsel are to be allowed an unfair advantage, the trial judge must have the power to declare a mistrial," *id*. at 513, when, in his assessment, a fair trial designed to end in a just judgment is unlikely to result, *see id*. at 516 (citing *Wade v. Hunter*, 336 U.S. 684, 689 (1949)).  *Washington* shows that the trial court here could lawfully persist in its declaration of a mistrial to protect the State's right to a fair trial, even if a mistrial did not protect Hartman.

No one here has claimed the trial court acted to protect the State.  But the Montana Supreme Court's analysis suggests the trial court's declaration of a mistrial was necessary to ensure Hartman did not obtain a "windfall" from his attorney's time mismanagement.  *See* Order at 6–7, *Hartman*, No. OP 22-0037.  As the State is the party with an interest in preventing unfair advantage to the defendant, it is appropriate to consider whether a mistrial was necessary to protect the State's right to a fair trial.

For three reasons, this Court is unable to find cognizable prejudice to the State.  First, the State caused at least some avoidable delay, and did so very late in

the trial.  The State knew, at least by the time of the final pretrial conference, that

defense counsel intended to call Hartman's wife, Ginny, as a witness.  Counsel

asked that she be allowed to attend trial with her husband despite the exclusion of

witnesses under Montana Rule of Evidence 615.  Over the State's objection, the

court allowed Ginny to attend.  *See* Final Pretrial Conf. Tr. (Doc. 10-9) at 5:5–20.

Through cross-examination and the defense case-in-chief, it became clear (if

it was not clear before) that Ginny was an important witness.  She worked in the

business alongside Hartman, and she signed many of the documents introduced

into evidence and contested at trial.  *See, e.g.*, 2 Trial Tr. (Doc. 10-1) at 115:6–22,

157:7–25; 5 Trial Tr. at 784:14–786:6; 6 Trial Tr. at 1196:19–1199:11.  The State

had pursued an administrative action against her and knew who her lawyer was in

that proceeding.  *See* 7 Trial Tr. at 1503:24–1504:13.

Defense counsel presented six witnesses before calling Ginny.  Not until he

called her to the stand did the State ask for a chambers conference and assert a

"near 100 percent possibility that the State will be asking questions on cross-

examination of Ms. Hartman that could tend to incriminate her."  7 Trial Tr. at

1502:21–22–24.  It was 4:15 p.m. on Wednesday, February 3, right in the middle

of the defense's attempt to get its entire case in within two trial days.  Rather than

simply agreeing to allow the trial court to immunize her testimony, *see* Mont. Code

Ann. § 46-15-331; 7 Trial Tr. at 1507:16–1508:18, the State asked for time to

decide whether *it* should offer Ginny immunity.  And, as it happened, it raised the

issue on the only day when the trial court intended to hold the jury past 5:00 p.m.

to hear testimony (although defense counsel apparently was not made aware of the

plan).  *See* 7 Trial Tr. at 1512:20–25.[8]  The jury went home early.

      In other respects, the State and defense counsel evidently worked well

together.  *See, e.g.*, 4 Trial Tr. (Doc. 10-3) at 663:25–666:19; 6 Trial Tr. at 1275:9–

16; Final Pretrial Conf. Tr. at 11:7–12:14; Pretrial Conf. Tr. at 20:4–21:20, 33:1–9,

34:20–36:5.  But, on Wednesday as well as Thursday, the State's belated action on

Ginny's Fifth Amendment rights occupied well over an hour of jury time.  If the

State believed it was suffering prejudice from defense counsel's delay, it likely

would have broached the issue with defense counsel and/or the trial court well

before Ginny was called to testify.

      The second reason the Court cannot find the State was prejudiced is found in

---

[8]  Probably unintentionally, the State unnecessarily elevated the temperature of the discussion by asking that Ginny be given a "*Miranda* warning."  Ginny's situation called for advice of her Fifth Amendment right not to incriminate herself, her exercise of the right, and the trial court's grant of immunity so that her testimony could *not* be used against her.  That is not the same thing as advising her that she does not have to talk, she may have a lawyer present if she chooses to talk, and if she *does* talk, what she says *can* be used against her.  *See Miranda v. Arizona*, 384 U.S. 436, 471 (1966).  Use of the term may also have prompted the trial court to suggest that the county attorney, prosecutor Boris—who was going to cross-examine Ginny— should be the one to advise her of her rights.  *See* 7 Trial Tr. at 1510:4–12.  Since the prospect of prosecution is why people receive *Miranda* warnings, a reasonable person could take the State's reference to *Miranda* to indicate the State was preparing to prosecute Ginny.

    The next day, the State elicited testimony from Ginny that she believed she had been threatened with prosecution because that is what defense counsel told her counsel.  *See* 8 Trial Tr. at 1739:7–22.  But it was the State that misspoke.

its response to the trial court's declaration of a mistrial. Initially, the State requested "equal time" to cross-examine Hartman plus its remaining rebuttal time. *See* 9 Trial Tr. at 1787:16–19. But after defense counsel asked the trial court to reconsider, the State offered to "streamline everything to get this matter before the jury" and do "anything possible to make sure that these victim witnesses and these jurors, or another panel, don't have to go through this again." *Id*. at 1793:8–24. If the State thought it could be prejudiced by an attempt to proceed to verdict, it would not have agreed to defense counsel's suggestion.

Finally, even in this proceeding, the State has not suggested that counsel's alleged delay or ineffective time management unfairly enhanced the prospect of Hartman's acquittal. The Court cannot perceive how it did.

Mistrial was not necessary to protect the State's right to a fair trial.

## C.  Conclusion

Without giving notice that it was contemplating a mistrial, the trial court declared one on the morning of the last day of a nine-day trial. This ruling, when the trial court believed Hartman needed three hours to testify, was precipitous. Whether it was an abuse of discretion or not, the trial court then stood by its mistrial ruling *because* defense counsel reduced the time his client would need for his testimony so that the case might be ready for the jury the same day. Counsel asserted Hartman's right to "this verdict from this jury" and selected the means to

36

achieve that end.  The State agreed to "streamline everything to get this matter before the jury," but the trial court refused to try it.

The Court is not saying that a trial judge can never have adequate grounds to declare a mistrial if she is convinced defense counsel's performance is unreasonable or unprofessional.  But a trial judge must always be mindful of how much he or she does not know.  The questions counsel asks of the defendant and how long a witness examination should take fall entirely within the heartland of the confidential attorney-client relationship and the Sixth Amendment.  The client had a right to testify, and defense counsel did what he thought appropriate to realize it. The trial court unnecessarily substituted its own judgment for counsel's and thereby deprived Hartman of both his Sixth Amendment right to counsel and his federal constitutional protection against double jeopardy.  Hartman is entitled to the writ he seeks.

Accordingly, IT IS ORDERED:

1.  Hartman's petition (Doc. 1) is UNCONDITIONALLY GRANTED.

2.  Respondent may not retry Petitioner Hartman on the charges filed in *State v. Hartman*, Cause No. DC-19-75 (Mont. 19th Jud. Dist. Court).

3.  This Order is STAYED.

4.  If a notice of appeal is timely filed, the stay will continue pending review by the Court of Appeals.

5.  Unless a notice of appeal is timely filed, the State must file notice within 35 days of its dismissal of Cause No. DC-19-75.

DATED this 12th day of August, 2022.

_____
Dana L. Christensen, District Judge
United States District Court